UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 2:17cr_152_ |
| | ) | |
| v. | ) | 18 U.S.C. § 371 |
| | ) | Conspiracy to Commit Wire Fraud |
| | ) | (Count One) |
| CLAYTON AKEEM PRESSLEY | ) | |
| a/k/a "Brian Johnson" | ) | 18 U.S.C. § 1957 |
| | ) | Unlawful Monetary Transactions |
| | ) | (Count Two) |
| | ) | |
| Defendant. | ) | 18 U.S.C. §§ 981(a)(1)(C) & 982(a)(1) |
| | ) | 28 U.S.C. § 2461 |
| | ) | Criminal Forfeiture |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

## INTRODUCTORY ALLEGATIONS

1. At all times relevant to the criminal information, defendant CLAYTON ("PRESSLEY"), also known as "Brian Johnson", was a Senior Chief Petty Officer in the United States Navy (USN) assigned to a Virginia Beach-based unit. Since 2012, PRESSLEY has owned, or managed, several businesses to include Fifth Column Solutions Group LLC, Pressley Enterprises, Inc., and Strategic Logistics Solutions Group, Inc. Additionally, PRESSLEY was the Chief Operating Officer of Firm G until its termination in 2016.

2. Firm G was a business headquartered in Tucson, Arizona that purported to be a professional services firm providing logistical support to government agencies. Conspirator 1 was the CEO of Firm G. All business done by Conspirator 1 on behalf of Firm G took place in Tucson, Arizona.

1

3. Fifth Column Solutions Group, LLC was the initial registered agent of Firm G. Despite being headquartered in Arizona, Firm G used Fifth Column Solutions Group's Chesapeake, Virginia address as its initial registered office. At all times relevant to this Information, Firm G listed PRESSLEY as an active employee of the business.

4. Contracting Firm V (Firm V) was a veteran owned, professional services firm providing logistical support services to industry and government agencies. Firm V is a Defense Logistics Agency (DLA) "prime vendor." Firm V is headquartered in San Diego, California. Firm V does business as "Industrial Exchange" and "At Your Command." "Industrial Exchange," specifically, is a subsidiary of Firm V and is a Virginia corporation operating in Southern California. NH and KH were sales representatives of Firm V, Industrial Exchange, and At Your Command at all times relevant to this criminal information.

5. Contracting Firm D (Firm D) is a government-contracting firm providing logistical support services for various military, law enforcement, and first responder organizations. Firm D is a DLA "prime vendor." Conspirator 2 was a sales representative of Firm D at all times relevant to this criminal information.

6. The DLA "Prime Vendor" model is a procurement process intended to utilize the private sector's logistical capabilities to reduce delivery time to, and simplify the purchasing process for, the United States Government. The prime vendor process starts with a contractual agreement between the government and a commercial vendor, e.g., Firm V or Firm D. The prime vendor buys inventory from a variety of suppliers and the inventory is stored in commercial warehouses. The customer, e.g., the USN, orders supplies from the prime vendor, largely through electronic ordering systems. The supplier then ships directly to the customer, as needed, within a specific geographic area. This process reduces delivery time to the customer

and, by using the private sector's storage and distribution system, reduces DOD warehousing and redistribution costs.

7. The Department of Defense (DOD) also uses a goods-purchasing system known as Electronic Mall (E-Mall). E-Mall is an internet based ordering platform meant to provide a full service e-commerce site to find and acquire finished goods and services from the commercial marketplace. DLA runs E-Mall, which is a major mechanism through which the USN purchases goods from prime vendors.

8. Beginning in approximately 2008, Firm V applied for and received authorization from the DLA to sell products to the United States Government through E-Mall.

9. KH and NH regularly employed product substitution in their sales to the USN through "Money Value Only" (MVO) sales orders. This process allowed Firm V to circumvent the normal procurement process in E-Mall. With a MVO, a military command could place a sales order with Firm V for products available in Firm V's E-Mall "catalog." However, Firm V would then take the funds received for that sales order, and use them to purchase substitute products *not* available through Firm V's catalog. In this way, Firm V could provide a military unit with virtually any product needed, under the guise of a purchase for products in Firm V's approved E-Mall catalog.

10. DLA's "Troop Support" component utilizes two contracting systems to streamline procurement of goods and expenditure of DOD funds. Both systems fall under the DLA "Tailored Logistics Support Programs" (TLSP). Firm D is a party to this program by contract and is authorized to provide a range of special operational equipment to the Department of Defense.

11. Conspirator 3 is an officer in the United States Navy (USN). At all times relevant to this information, Conspirator 3 worked at a Virginia Beach-based U.S. Navy unit. Conspirator 3 had authority to make purchases for his unit through prime vendors using either DOD E-Mall or the TLSP.

12. Normally, the USN procures goods through a given command's supply officer soliciting them through prime vendors using DOD E-Mall, or through requests for goods to particular prime vendors in a competitive bidding process amongst vendors party to the DLA-TLSP contract. If a prime vendor cannot supply the goods needed, then the prime vendor may subcontract the business to a vendor who can. A supply officer, as a representative of the USN, should not contact a sub-vendor directly during the active bidding process, or direct that a prime vendor use a particular sub-vendor without official justification. Additionally, a supply officer does not direct specific prices for quotes made by sub-vendors to prime vendors, or otherwise manipulate the generation of a quote for goods through the vendor.

13. Between May 2014, through November 2014, PRESSLEY, Conspirators 1, 2, 3, and others known and unknown, took advantage of these procurement mechanisms for personal gain. Specifically, PRESSLEY, Conspirators 1, 2, 3, and others known and unknown, conspired to, and did, defraud the United States Navy, a department of the United States Government, in the Eastern District of Virginia and elsewhere through multiple acts including, but not limited to, contract steering, and product substitution.

## COUNT ONE

1.  The allegations contained in the "Introductory Allegations" section of this Criminal Information are re-alleged and incorporated by reference as if fully set forth herein.

## THE CONSPIRACY

2.  From in or about May 2014, through in or about November 2014, the exact dates being unknown, in the Eastern District of Virginia, and elsewhere, defendant CLAYTON AKEEM PRESSLEY, Conspirators 1, 2, 3, and others, known and unknown, knowingly and intentionally combined, conspired, confederated and agreed together and with each other to commit an offense against the United States, to wit: wire fraud, to devise and intend to devise any scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit, or cause to be transmitted by means of wire, radio, or television communication in interstate and foreign commerce, any writings signals, pictures, or sounds for the purpose of executing such scheme or artifice, in violation of Title 18, United States Code, Section 1343.

## THE PURPOSE OF THE CONSPIRACY

3.  The purpose of the conspiracy was for PRESSLEY and others to personally profit by steering contracts for training aids from the USN to a specific sub-vendor company, created, owned, and operated by the conspirators themselves, but never fulfilling those contracts.

## THE WAYS, MANNER, AND MEANS OF THE CONSPIRACY

The ways, manner and means of the conspiracy by which the defendant and his conspirators sought to accomplish the conspiracy included, but were not limited to, the following:

4. It was part of the conspiracy for PRESSLEY and Conspirator 1 to incorporate Firm G on or about May 20, 2014, with the PRESSLEY-owned Fifth Column Solutions Group as Firm G's registered agent. PRESSLEY assisted in the day-to-day operation of Firm G by using the alias "Brian Johnson" in order to conceal his involvement in the scheme.

5. It was part of the conspiracy for Firm G to act as a vendor of "inert training aids," but in reality, Firm G would serve as a mechanism for the conspirators to obtain government money for personal use.

6. It was part of the conspiracy that the products requested by Conspirator 3 on behalf of the USN would be "inert training aids" provided by Firm G. Navy units use these aids in routine training. Inert training aids are replenished frequently, as they are destroyed during training.

7. All conspirators understood that Conspirator 3, as supply officer, would obtain approval to spend USN money on these items and others, and initiate transactions with Firm G for inert training aids.

8. It was part of the conspiracy for Firm G to use Firm V and Firm D as prime vendors through which the conspirators could steer government contracts for inert training aids to Firm G. PRESSLEY and Conspirator 3 leveraged their personal connections with Conspirator 2 at Firm D, and with NH and KH at Firm V to steer these contracts.

9. It was part of the conspiracy that Firms D and V would not directly supply the products requested by the USN. Instead, Conspirator 2, NH, and KH, acting as agents of their respective companies, would subcontract USN contracts exclusively to Firm G. In return, Conspirator 2 received kickbacks for Firm D's use of Firm G. NH and KH received their standard commissions for securing business for Firm V.

10. For a TLSP purchase, Conspirator 3 understood that Firm G would provide quotes for inert training aids to several prime vendors. Firm G would offer Firm D a quote that was 18% less than those offered to the other vendors, thus ensuring that Firm D would "win" the bid. There was no legitimate business reason, such as a bona fide volume discount, for sending Firm D quotes that were so much less than those sent to other vendors.

11. For procurements through DOD E-Mall, Conspirator 3 understood that Firm V would grant Firm G the subcontract by virtue of Firm G's connections with KH and NH, and their expertise in product substitution. Additionally, since purchases made through DOD E-Mall are limited to less than $100,000, Firm V would engage in "split purchasing." That is, Firm V would break up a purchase with Firm G into several purchases, so that no single purchase exceeded the $100,000 limit.

12. It was part of the conspiracy that Firm V would receive purchase orders from Conspirator 3 for "consumable items." "Consumable items" are commodities that military units use, and dispose of, relatively quickly, e.g. chairs, tables, rubber bands, pens, etc. Once money was released to Firm V for these items, Firm V would instead use the money to purchase inert training aids from Firm G.

13. PRESSLEY, Conspirator 1, and Conspirator 3 knew and agreed that Firm G would not provide any products to the government. Despite not providing anything to the government, Firm G would accept payment for a given subcontract, and distribute that payment amongst the various conspirators, and the conspirators' creditors.

14. In furtherance of the conspiracy, Firm G would purport to "drop-ship" products to Conspirator 3's military unit. That is, Firm G would purport to directly deliver the purchased goods to Conspirator 3 after they were "purchased" by the prime vendor. Conspirator 3 would

7

then sign fraudulent delivery documentation to give the appearance that Firm G was actually delivering the products ordered.

15. PRESSLEY, Conspirator 1, and Conspirator 3 initially agreed that they would divide the government money provided to Firm G amongst themselves in percentages of 40% for PRESSLEY, 40% for Conspirator 3, and 20% for Conspirator 1.

16. It was a part of the conspiracy that Firm G maintained a Wells Fargo Business Checking account, ending in 2744. Firm G deposited money from government contracts into this account.

17. It was a part of the conspiracy that Conspirator 1 would establish four Wells Fargo Business Market Rate Savings accounts. One account was associated with each of PRESSLEY, Conspirator 1, and Conspirator 3, and one was reserved for business taxes. Firm G would deposit each conspirator's share of the proceeds into that conspirator's respective account.

18. Additionally, it was part of the conspiracy that PRESSLEY would accept portions of his share of the proceeds, and those of Conspirator 3, into his Wells Fargo Gold Business Services account associated with Pressley Enterprises.

19. It was part of the conspiracy that PRESSLEY, and all co-conspirators would use interstate wire communications, via the internet, to transmit messages, purchase orders, and other documents across state lines in furtherance of the scheme.

**OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY**

In furtherance of the conspiracy and to effect the purpose thereof, the following overt acts, among others, were committed in the Eastern District of Virginia and elsewhere:

**FIRM D/FIRM G CONTRACT**

20. On May 28, 2014, Conspirators 1, 2, 3, and PRESSLEY (using the alias "Brian Johnson") collaborated via email to facilitate a purchase of inert training aid packages from Firm G, through Firm D.

21. Conspirator 2 sent an email to Conspirator 3 requesting that Conspirator 3 provide him a "quote" for the inert training aid packages. Conspirator 3, sitting in Virginia Beach, Virginia, forwarded this correspondence to Conspirator 1, in Tucson, Arizona, and PRESSLEY, explaining that Conspirator 2 was "ready to work this today!"

22. On May 29, 2014, Conspirator 3 sent an email to PRESSLEY and Conspirator 1 asking that they "please copy and paste this into a quote and send to [Conspirator 2] at [Firm D] as soon as possible." The email provided a description of the inert training aid packages, and associated prices totaling $208,131.90.

23. On May 29, 2014, Firm G sent invoice number 2014-277 to Conspirator 2 at Firm D for four packages of inert training aids, ten units of each, totaling $208,231.90. The invoice listed Conspirator 1 as the Firm G point of contact.

24. On May 29, 2014, PRESSLEY, as "Brian Johnson," sent an email to Conspirator 2 that included a "Vendor Setup Form" for Firm G, backdated to "4/17/2014."

25. At a date unknown, Conspirator 3 made requests to multiple prime vendors, including Firm D, for inert training aid packages, asking that they use Firm G specifically to fulfill his request. All five prime vendors solicited quotes from Firm G for the requested items.

26. On June 23, 2014, Conspirator 1 emailed quotes as requested to each of the five prime vendors. Conspirator 1 quoted four of the five prime vendors a price for the training aids of $245,713.60. Conspirator 1 quoted Firm D a price of $208,231.90 (18% lower than the quotes offered to the four other vendors).

27. Once the bid was "won" for Firm D, Firm D generated two purchase orders on June 25, 2014. At 4:27PM the same day, Conspirator 1, using a Fifth Column Solutions Group email, confirmed receipt of the purchase orders, and indicated that Firm G would ship the products "tomorrow," June 26, 2014.

28. On July 25, 2014, a representative from Firm D requested that Conspirator 1 provide tracking information and invoices for the two Firm D purchase orders. On that same day, Conspirator 1 sent Conspirator 3 an email requesting that Conspirator 3 sign Firm D's delivery receipt "and put 6/26/14 as delivery date, and maybe throw in a time." Conspirator 3 complied by signing delivery receipts for each purchase order, and indicating a delivery receipt date and time for each of June 26, 2014, at 1430. These receipts confirmed two deliveries of inert training aids, $208,231.90-worth in each, for a total purchase of $416,463.80. Neither delivery in fact took place.

29. On July 29, 2014, Firm D remitted payment of $416,463.80 to Firm G. Firm G deposited this payment into a Wells Fargo business checking account, ending in 2744 on July 30, 2014. On that same day, approximately $282,000.00 was transferred from the Firm G business checking account, to the Firm G Business Market Rate Savings account associated with PRESSLEY.

### FIRM V/FIRM G CONTRACT 1

30. On May 15, 2014, Conspirator 1, in Tucson, Arizona, sent Conspirator 3, in Virginia Beach, Virginia, an email stating in part: "Attached is the quote you requested for the inert training aids." The same day, Conspirator 3 responded to Conspirator 1, KH, and NH, thanking Conspirator 1 for the "quick turnaround", and informing Conspirator 1 that KH and NH would be Firm G's primary points of contact at Firm V. Conspirator 3 stated in the email that

"[KH and NH] are our vehicle for expending funds," and that the quote was "ready to go for you...I am standing by for you to send me your documents."

31. The quote described four packages of "inert training aids," 25 units of each type, at a total price of $520,329.75.

32. On May 22, 2014, PRESSLEY (using the alias "Brian Johnson") sent an email to Conspirator 3 stating that he and Conspirator 1 had spoken with a representative at Firm V who requested that Firm G provide more detail of the contents of "inert training aid packages."

33. On May 27, 2014, Conspirator 3 sent an email to KH and NH, carbon copying Conspirator 1 and PRESSLEY, describing the contents of the packages. In response, KH requested that Conspirator 1 compile the described contents into a revised quote.

34. On June 2, 2014, KH sent an email to Conspirator 3 explaining that all Firm G quotes were updated and that a purchase order was prepared. Conspirator 3 forwarded this email to PRESSLEY and Conspirator 1.

35. On June 3, 2014, Firm V divided the purchase into eleven smaller purchase orders, and sent these documents to Firm G for the quoted training aid packages. For each of these purchase orders, Conspirator 3 signed the respective packing slips to indicate delivery of the goods. However, no goods were ever delivered.

36. On June 16, 2014, KH sent an email to Conspirator 3 stating, "The last step is getting an invoice from [Firm G]." Conspirator 3 forwarded this email to PRESSLEY and Conspirator 1 stating, "Figure this out."

37. On June 17, 2014, Firm V provided Firm G a check in an amount of $520,579.75. Firm G deposited this check into its Wells Fargo business checking account ending in 2744 on June 20, 2014.

38. On July 1, 2014, Firm G transferred $166,000.00 into the Business Market Rate Savings account associated with PRESSLEY, and $366,000.00 into a Wells Fargo Gold Business Services account associated with Pressley Enterprises.

### FIRM V/FIRM G CONTRACT 2

39. On June 20, 2014, Conspirator 3 directed Conspirator 1 to generate a new quote from Firm G for inert training aid packages, totaling $506,323.85. Conspirator 1 did so, generating quote number 2014-286.

40. On June 23, 2014, Conspirator 3 corresponded with Firm V. Conspirator 3 provided Firm V with the quote from Firm G via email. Conspirator 3 then directed Firm V to start "building carts" in E-Mall for substitute, consumable items that would enable the release of USN funds to Firm V.

41. Firm V built carts for various consumables unrelated to the training aids requested by Conspirator 3. For instance, Firm V built carts for 428 "router tables." Firm V then generated a purchase order made out to Firm G for the actual training aids requested and earlier quoted by Conspirator 1.

42. On July 17, 2014, Firm G received four purchase orders from Firm V, doing business as two subsidiary companies. Conspirator 3 then signed packing slips for these orders, representing delivery of the items supposedly purchased. No items were actually delivered from Firm G.

43. Firm V provided two checks to Firm G for the purchase orders associated with this deal. The first, for $353,950.90, and the second for $152,372.95. These checks total $506,323.85 in government money going to Firm G. These checks were deposited into Firm G's Wells Fargo checking account ending in 2744 on July 29, 2014.

## FIRM V/FIRM G CONTRACT 3

44. On or about October 2014, Conspirator 3 and Conspirator 1 coordinated with Firm V for a third purchase of inert training aids.

45. Conspirator 3 generated and signed a purchase request form requesting four types of inert training aid packages, several units of each, totaling $240,021.33 worth of goods.

46. On October 24, 2014, Conspirator 3 again directed Conspirator 1 to send him a quote made out to Firm V for these inert training aids. Conspirator 3 directed that this quote total close to $150,000. Conspirator 1 complied, and sent a quote to Firm V from a Fifth Column Solutions Group email address, quoting a price of $153,216.45.

47. On October 27, 2014, Conspirator 3 sent Conspirator 1 another email requesting that she revise the quote so that the dollar figure came "as close as possible to $168,014 without going over." Conspirator 1 then sent Firm V a revised quote for the training aids, totaling $167,164.20.

48. Firm V generated purchase orders and packing slips that Conspirator 3 signed and marked to indicate delivery of the goods ostensibly purchased from Firm G. Again, no items were ever delivered from Firm G to the USN.

49. On November 18, 2014, Firm V provided a check to Firm G for $167,164.20. On November 19, 2014, this check was deposited into Firm G's Wells Fargo business checking account ending in 2744.

50. On November 21, 2014, Firm G transferred $33,990.00 into the Business Market Rate Savings account associated with PRESSLEY.

(In violation of Title 18, United States Code, Section 371).

## COUNT TWO

1. The allegations contained in the "Introductory Allegations" section and Count One of this Criminal Information are re-alleged and incorporated by reference as if fully set forth herein.

2. On or about July 2, 2014, in the Eastern District of Virginia, defendant CLAYTON AKEEM PRESSLEY did unlawfully and knowingly engage, attempt to engage, and cause others to engage and attempt to engage in a monetary transaction by, through, and to a financial institution affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00, such funds having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, as follows: an electronic payment of $40,336.40 in unlawful proceeds from his wire fraud scheme, from his Pressley Enterprises Wells Fargo Gold Business Services Account ending in 0389, to his personal Marriott Rewards Credit Card Account ending in 2033.

(In violation of Title 18, United States Code, Section 1957).

## **FORFEITURE**

1. The defendant, if convicted of the violation alleged in count one of this information, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

2. The defendant, if convicted of the violation alleged in count two of this information, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, involved in the violation, or any property traceable to such property.

3. If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

4. The assets subject to forfeiture include, but are not limited to:

   a. A monetary judgment in the amount of not less than $644,212.68, representing the proceeds of count one obtained by PRESSLEY.

(In accordance with 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(2)(A); 28 U.S.C. § 2461(c).)

Dana J. Boente
United States Attorney

By: _____
David A. Layne
Special Assistant United States Attorney
Colorado State Bar No. 47989
United States Attorney's Office
World Trade Center, Suite 8000
101 W. Main Street
Norfolk, Virginia 23510
Office Number - 757-441-3221
E-Mail Address – david.layne@usdoj.gov