FILED
IN OPEN COURT

NOV 1 4 2017

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

UNITED STATED DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) CRIMINAL NO. 2:17CR152 |
| CLAYTON AKEEM PRESSLEY, | ) |
| a/k/a "Brian Johnson" | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF FACTS

The parties stipulate that the allegations in Counts One and Two of the Criminal Information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt:

1. At all times relevant to the Criminal Information, defendant CLAYTON AKEEM PRESSLEY ("PRESSLEY"), also known by the alias "Brian Johnson", was a Senior Chief Petty Officer in the United States Navy (USN) assigned to a Virginia Beach-based naval unit. Since 2012, PRESSLEY has owned, or managed, several businesses to include Fifth Column Solutions Group LLC, Pressley Enterprises, Inc., and Strategic Logistics Solutions Group, Inc. Additionally, PRESSLEY was the Chief Operating Officer of Firm G until its termination in 2016.

2. Firm G was a business headquartered in Tucson, Arizona, but incorporated in Virginia, that purported to be a professional services firm providing logistical support to

government agencies. Conspirator 1 was the CEO of Firm G. All business performed by Conspirator 1 on behalf of Firm G took place in Tucson, Arizona.

3. PRESSLEY's 5th Column Solutions Group, LLC was the initial registered agent of Firm G. Further, Firm G listed 5th Column Solutions Group's Chesapeake, Virginia address as its initial registered office. At all times relevant to the pending Information, Firm G listed PRESSLEY as an active employee of the business.

4. Contracting Firm V (Firm V) is a veteran owned, professional services firm providing logistical support services to industry and government agencies. Firm V is a Defense Logistics Agency (DLA) "prime vendor." Firm V is headquartered and does its business in San Diego, California. NH and KH were sales representatives of Firm V at all times relevant to this criminal information.

5. Contracting Firm D (Firm D) is a government-contracting firm providing logistical support services for various military and first responder organizations. Firm D is a DLA "prime vendor." Conspirator 2 was a sales representative of Firm D at all times relevant to this criminal information.

6. The DLA "Prime Vendor" model is a procurement process intended to utilize the private sector's logistical capabilities to reduce deliver time to, and simplify the purchasing process for, the United States Government. The prime vendor process starts with a contractual agreement between the government and a commercial vendor, e.g., Firm V or Firm D. The prime vendor buys inventory from a variety of suppliers and the inventory is stored in commercial warehouses. The customer, e.g., the USN, orders supplies from the prime vendor, largely through electronic ordering systems, or competitive bidding amongst prime vendors. The supplier then ships directly to the customer, as needed, within a specific geographic area. This



process reduces delivery time to the customer and, by using the private sector's storage and distribution system, reduces DOD warehousing and redistribution costs.

7. One method of procurement under the prime vendor model is a goods-purchasing system known as DOD Electronic Mall (E-Mall). E-Mall is an internet based ordering platform meant to provide a full service e-commerce site to find and acquire finished goods and services from the commercial marketplace. Beginning in approximately 2008, Firm V applied for and received authorization from the DLA to sell products to the United States Government through E-Mall.

8. Another method of procurement falls under DLA's "Troop Support" component, which utilizes two "prime" contracting systems to streamline procurement of goods and expenditure of DOD funds. Both systems fall under the DLA "Tailored Logistics Support Programs" (TLSP). Firm D is a party to this program by contract and is thus authorized to provide a range of special operational equipment to the Department of Defense. Purchases made under the TLSPs are subjected to a competitive bidding process amongst the various vendors that are party to the TLSPs to ensure that the government obtains the best possible prices for goods.

9. Conspirator 3 is an officer in the United States Navy. At all times relevant to this information, Conspirator 3 worked at a Virginia Beach-based naval unit as his unit's supply officer. Conspirator 3 thus had authority to make purchases for his unit through prime vendors.

10. Normally, the USN procures goods through a given command's supply officer soliciting them directly through prime vendors using E-Mall, or through requests for goods to vendors that are party to the DLA-TLSP prime contracts. If a prime vendor cannot supply the goods needed, then the prime vendor may subcontract the business to a vendor who can. A

3

supply officer, as a representative of the USN, should not contact a sub-vendor directly during the active bidding process, or direct that a prime vendor use a particular sub-vendor without official justification. Additionally, a supply officer does not direct specific prices for quotes made by sub-vendors to prime vendors, or otherwise manipulate the generation of a quote for goods through the vendor.

11. From in or about May 2014, through in or about November 2014, the exact dates being unknown, in the Eastern District of Virginia, and elsewhere, defendant CLAYTON AKEEM PRESSLEY, Conspirators 1, 2, 3, and others, known and unknown, knowingly and intentionally combined, conspired, confederated and agreed together and with each other to commit an offense against the United States, to wit: wire fraud, to devise and intend to devise any scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and to transmit, or cause to be transmitted by means of wire, radio, or television communication in interstate and foreign commerce, any writings signals, pictures, or sounds for the purpose of executing such scheme or artifice.

12. The purpose of this conspiracy was for PRESSLEY and others to personally profit by steering contracts for training aids from the USN to a specific sub-vendor company, owned and managed by two of the conspirators themselves, and never fulfilling those contracts.

13. On or about March 26, 2014, PRESSLEY and Conspirator 1 had a conversation in which PRESSLEY described to Conspirator 1 that Conspirator 1 "needed to be independently wealthy", and that PRESSLEY knew how to make that happen. PRESSLEY described to Conspirator 1 that they could have "everything they ever dreamed of" for their children.

14. In April, 2014, PRESSLEY advised Conspirator 1 to purchase a prepaid phone to use as a business phone line. PRESSLEY explained during this conversation that he could not use his own cell phone for the business due to his status as an active duty service member, who, in accordance with their scheme, would be doing business with the United States Navy through purchases made by Conspirator 3 on behalf of his unit.

15. On or about May 20, 2014, PRESSLEY and Conspirator 1 worked together to incorporate Firm G. PRESSLEY filed all the necessary paperwork to effect Firm G's incorporation in Virginia. PRESSLEY used his own business, Fifth Column Solutions Group, as the registered agent, using an address in Chesapeake, Virginia as Firm G's registered address. Conspirator 1 was named as Firm G's Chief Executive Officer. A Tucson, Arizona address served as Firm G's headquarters and sole place of business. PRESSLEY worked as an employee for Firm G, using the alias "Brian Johnson."

16. Conspirator 1 established five corporate bank accounts at Wells Fargo Bank on behalf of Firm G. One account served as the Firm G business checking account, a separate Wells Fargo business savings account held money for business taxes. The remaining accounts were savings accounts reserved for PRESSLEY, Conspirator 1, and Conspirator 3, respectively.

17. Firm G's business purpose was to act as a vendor of "inert training aids" and other logistical and tactical equipment for military use. Inert training aids are military practice tools that resemble explosive devices. Military units use inert training aids in routine training. Because military units destroy these aids in training, they are replenished frequently.

18. Firm G used Firm V and Firm D as prime vendors through which the conspirators funneled government contracts for inert training aids to Firm G. To facilitate this process,

PRESSLEY and Conspirator 3 leveraged connections with Conspirator 2, who at the time was acting as a rogue employee of Firm D, and with NH and KH at Firm V.

19. All conspirators understood that Conspirator 3's role in the conspiracy was to obtain approval to spend USN money on inert training aids or other items, and to initiate transactions with Firm G for inert training aids.

20. It was part of the conspiracy that Conspirator 2, NH, and KH, acting as agents of their respective vendors, would subcontract USN contracts exclusively to Firm G at the request of Conspirator 3. In return, Conspirator 2 received a kickback for Firm D's use of Firm G. NH and KH received their standard commissions for securing business for Firm V. Through the actions of the conspirators, Firm G subcontracted once with Firm D, and three times with Firm V over the course of the conspiracy and wire fraud scheme.

21. PRESSLEY and Conspirator 3 knew and agreed that Firm G would not provide any products to the government. Conspirator 1 became aware of this fact sometime in August, 2014 when PRESSLEY explained that the invoices that Conspirator 1 prepared on behalf of Firm G were not actually being fulfilled. Indeed, Firm G maintained no product inventory of any sort, nor had any capability of fulfilling government contracts whatsoever. Moreover, Conspirator 1, as the CEO of Firm G, did not know what an inert training aid was until Conspirator 3 directed Conspirator 1 to visit www.inertproducts.com in order to collect information for an invoice. Despite never providing any product to the government, Firm G accepted payments for four subcontracts in total, and distributed those payments amongst the various conspirators, and the conspirators' creditors.

22. In furtherance of the conspiracy, Firm G purported to directly deliver the contracted-for goods to Conspirator 3 after they were "purchased" by the prime vendor. In this

6

way, Firms D and V would never have an opportunity to physically check what products were being delivered, if any were being delivered at all. Conspirator 3 would simply sign fraudulent delivery documentation confirming that the USN had received Firm G's products.

23. PRESSLEY, Conspirator 1, and Conspirator 3 initially agreed that they would divide the government money provided to Firm G amongst themselves in percentages of 40% for PRESSLEY, 40% for Conspirator 3, and 20% for Conspirator 1.

24. Firm G deposited each conspirators' share of the proceeds of the conspiracy into that conspirator's respective Wells Fargo Business Savings account. Additionally, PRESSLEY accepted portions of his share of the proceeds, and those of Conspirator 3, into his Pressley Enterprises Wells Fargo Gold Business Services account.

25. PRESSLEY, Conspirator 1, and Conspirator 3 understood that in furtherance of their conspiracy and scheme, communications between the conspirators would take place via interstate wire transmission, namely, emails sent over the internet between Tucson, Arizona, Virginia Beach, Virginia, San Diego, California, and other locations.

26. On May 28, 2014, Conspirators 1, 2, 3, and PRESSLEY (using the alias "Brian Johnson") collaborated via email to facilitate a purchase of inert training aid packages from Firm D and Firm G. Conspirator 2 sent an email to Conspirator 3 requesting that Conspirator 3 provide him a "quote" for the training aid packages, as well as a Firm G point of contact and phone number. Conspirator 3 forwarded this correspondence to Conspirator 1 and PRESSLEY, explaining that Conspirator 2 was "ready to work this today!"

27. On May 29, 2014, Conspirator 3 sent an email to PRESSLEY and Conspirator 1 asking that they "please copy and paste this into a quote and send to [Conspirator 2] at [Firm D] as soon as possible." The email provided a description of the inert training aid packages, how

many units of each package were to be purchased, and associated prices, totaling $208,131.90. The email also provided Conspirator 2's contact information.

28. On May 29, 2014, Firm G sent a fraudulent "invoice" "attention to" Conspirator 2 at Firm D for four packages of inert training aids, ten units of each, totaling $208,231.90. The invoice listed Conspirator 1 as the Firm G point of contact.

29. On May 29, 2014, PRESSLEY, as "Brian Johnson," sent an email to Conspirator 2 that included a Firm G "Vendor Setup Form" backdated to "4/17/2014." The next day, an unwitting representative of Firm D, having no knowledge of the scheme, sent Conspirator 1 an email confirming receipt of the vendor setup form. Firm D required a completed Vendor Setup Form before engaging in business with Firm G.

30. On June 25, 2014, Firm D generated two purchase orders for Firm G's inert training aids. The same day, Conspirator 1, using a Fifth Column Solutions Group email address, emailed confirmation of the purchase orders, and indicated that Firm G would ship the products "tomorrow," June 26, 2014. However, the purchase orders indicated a "deliver by date" of July 8, 2014.

31. On July 25, 2014, Conspirator 1, from Tucson, Arizona sent Conspirator 3, in Virginia Beach, Virginia, an email requesting that Conspirator 3 sign Firm D's delivery receipt "and put 6/26/14 as delivery date, and maybe throw in a time." Conspirator 3 executed the delivery receipts for each purchase order, falsely representing a delivery receipt date and time for each receipt of June 26, 2014, at "1430". These receipts confirmed two illegitimate deliveries of inert training aids, $208,231.90-worth in each, for a total purchase of $416,463.80. As Conspirator 3 was well aware, Firm G never delivered any items in relation to this purchase.

32. On July 29, 2014, Firm D remitted a payment of $416,463.80 to Firm G based on the fraudulent delivery receipts provided by Conspirator 3. This payment was deposited into Firm G's Wells Fargo business checking account on July 30, 2014.

33. On May 15, 2014, Conspirator 1, from Tucson, Arizona, sent Conspirator 3, in Virginia Beach, Virginia, an email stating in part: "Attached is the quote you requested for the inert training aids." The same day, Conspirator 3 responded to Conspirator 1, KH, and NH, thanking Conspirator 1 for the "quick turn around", and informing Conspirator 1 that KH and NH would be Firm G's primary points of contact at Firm V. Conspirator 3 stated in the email that "[KH and NH] are our vehicle for expending funds," and that the quote was "ready to go for you…I am standing by for you to send me your documents."

34. The May 15, 2014 quote described four packages of "inert training aids," 25 units of each type, at a total price of $520,329.75.

35. On May 22, 2014, PRESSLEY (using the alias "Brian Johnson") sent an email to Conspirator 3 stating that he and Conspirator 1 had spoken with a representative at Firm V who requested that Firm G provide more detail in their quote regarding the contents of "inert training aid" packages.

36. On May 27, 2014, Conspirator 3 sent an email to KH and NH, carbon copying Conspirator 1 and PRESSLEY detailing the contents of the packages.

37. On June 2, 2014, KH sent an email to Conspirator 3 explaining that all Firm G quotes had been updated and that a purchase order was prepared. Conspirator 3 forwarded this email to PRESSLEY and Conspirator 1.

38. On June 3, 2014, Firm V sent purchase orders via email to Firm G for the quoted training aid packages. For each of these purchase orders, Conspirator 3 signed the respective

packing slips, and circled the items as "delivered." Firm G never delivered any items in relation to this purchase.

39. On June 16, 2014, KH sent an email to Conspirator 3 stating, "The last step is getting an invoice from [Firm G]." Conspirator 3 forwarded this email to PRESSLEY and Conspirator 1 stating, "Figure this out."

40. On June 17, 2014, Firm V provided Firm G a check in an amount of $520,579.75. Firm G deposited this check into its Wells Fargo business checking account ending in 2744 on June 20, 2014.

41. On July 1, 2014, Firm G electronically transferred $166,000.00 into the Business Market Rate Savings account associated with PRESSLEY, and $366,000.00 in to a Wells Fargo Gold Business Services account owned by Pressley Enterprises, Inc.

42. On June 20, 2014, Conspirator 3 directed Conspirator 1 to generate a new quote from Firm G for inert training aids, totaling $506,323.85. Conspirator 1 did so, generating a quote for various inert training devices and aids.

43. On June 23, 2014, Conspirator 3 corresponded via email with Firm V. Conspirator 3 provided Firm V with the quote documents from Firm G, and explained that his unit would be "loading up for the next 24 months." Conspirator 3 then directed Firm V to "please start building carts" in E-Mall for the quoted items.

44. KH responded to Conspirator 3's email by stating Firm V would "work on this today." Firm V then generated purchase orders made out to Firm G for the training aids earlier quoted by Conspirator 1. By July 17, 2014, Firm G had received four purchase orders from Firm V, doing business as two subsidiary companies. Ultimately, Conspirator 3 signed illegitimate

packing slips for these orders, representing delivery of the items supposedly purchased. Firm G never delivered any of the items ostensibly purchased by the USN.

45. Firm V provided two checks to Firm G for the purchase orders associated with this sale. The first, for $353,950.90, and the second for $152,372.95. These checks total $506,323.85, in government money going to Firm G. These checks were deposited into Firm G's Wells Fargo checking account on July 29, 2014.

46. On August 12, 2014, Conspirator 1 electronically transferred $90,170.00 from Firm G's Wells Fargo checking account to a Wells Fargo Gold Business Services account owned by Pressley Enterprises, Inc.

47. On August 15, 2014, Conspirator 1 electronically transferred $39,754.00 from Firm G's Wells Fargo checking account to a Wells Fargo Gold Business Services account owned by Pressley Enterprises, Inc.

48. On September 26, 2014, Conspirator 1 electronically transferred $40,000.00 from Firm G's Wells Fargo checking account to a Wells Fargo Gold Business Services account owned by Pressley Enterprises, Inc.

49. In or around October 2014, Conspirator 3 and Conspirator 1 coordinated with Firm V for another purchase of inert training aids.

50. Conspirator 3 generated and signed a purchase request form requesting four types of inert training aid packages, several units of each, totaling $240,021.33 worth of goods.

51. On October 24, 2014, Conspirator 3 again directed Conspirator 1 via email to send him a quote made out to Firm V for these inert training aids. Conspirator 1 complied, and emailed a quote to Firm V, quoting $153,216.45, from a Fifth Column Solutions Group email address.

52. On October 27, 2014, Conspirator 3 sent Conspirator 1 another email requesting that Conspirator 1 revise the quote so that the dollar figure came "as close as possible to $168,014 without going over." Conspirator 1 then sent Firm V a revised quote for the training aids, totaling $167,164.20.

53. Firm V then generated purchase orders and packing slips associated with this third sale, which Conspirator 3 signed and marked to indicate delivery of the goods seemingly purchased from Firm G. Firm G did not deliver any of the goods purchased by the USN.

54. On November 18, 2014, Firm V provided a check to Firm G for $167,164.20. On November 19, 2014, Firm G deposited this check into Firm G's Wells Fargo business checking account.

55. In total, Firm G, by virtue of the actions of PRESSLEY, Conspirator 1, Conspirator 2, and Conspirator 3, Firm G entered into four subcontracts for inert training aids to be sold to the USN. In total, the USN spent $1,867,944.92 to acquire goods from Firm G. The USN received nothing from these purchases. Firm G received $1,194,067.90 in connection with the conspiracy, and the aforementioned fraudulent contracts.

56. PRESSLEY, Conspirator 1, and Conspirator 3 knowingly used interstate wire communications in furtherance of the purpose of their conspiracy and scheme, in order to transmit emails, contract proposals, purchase orders, delivery documentation, quotes, and invoices by email, through the internet.

57. On July 2, 2014, PRESSLEY knowingly received a deposit of $366,000 from Firm G's Wells Fargo business checking account into his Pressley Enterprises checking account.

58. The $366,000 deposit represented portions of both PRESSLEY, and Conspirator 3's respective shares of the proceeds of the Firm G wire fraud conspiracy. PRESSLEY knew

that said deposit represented money derived purely from the Firm G conspiracy and wire fraud scheme.

59. On or about July 2, 2014, PRESSLEY knowingly paid $40,366.40 of the proceeds of the Firm G conspiracy and wire fraud scheme, specifically, the deposit described in paragraph 57, above, toward his Marriott Rewards Credit Card from his Pressley Enterprises Wells Fargo Gold Business Services account.

60. PRESSLEY's Marriott Rewards Credit Card was a personal credit card held in PRESSLEY's name. PRESSLEY used this card to purchase personal items for both PRESSLEY and Conspirator 1.

61. PRESSLEY made purchases on his Marriott Rewards Credit Card including, but not limited to:

   a. On multiple dates in June, 2014, plane tickets on Delta airlines totaling $4,888.00;

   b. On May 22, 2014, $1,390.16 worth of goods from Pier1 Imports;

   c. On June 17, 2014, a $937.71 purchase at Ruth's Chris Steakhouse in Virginia Beach, VA;

   d. On June 16, 2014, a $1,175.22 stay at the Courtyard Marriott in Chesapeake, Virginia;

   e. On May 31, 2014, a $1,612.50 cash advance at Casino Del Sol in Tucson, Arizona;

   f. On June 25, 2014, two payments to Neiman Marcus Online, totaling $1,956.00;

   g. On July 3, 2014, a payment of $2,970.13 to Porsche of Tucson in Tucson, Arizona.

The defendant acknowledges that the foregoing statement of facts does not describe all of his conduct relating to the offenses charged in this matter.

           Dana J. Boente
           United States Attorney

By: _____
    David Layne
    Special Assistant United States Attorney
    Colorado State Bar No. 47989
    United States Attorney's Office
    World Trade Center, Suite 8000
    101 W. Main Street
    Norfolk, Virginia 23510
    Office Number - 757-441-6331
    E-Mail Address – david.layne@usdoj.gov

After consulting with my attorney, I hereby stipulate that the above statement of facts is true and accurate, and that had the matter gone to trial, the United States would have proved the same beyond a reasonable doubt.

_____
CLAYTON AKEEM PRESSLEY
Defendant

   I am the attorney for CLAYTON PRESSLEY III. I have carefully reviewed the above statement of facts with the defendant. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Bruce Sams
Counsel for Defendant

14